UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES LUCA,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Case No. 2:23-cv-11966
Magistrate Judge Anthony P. Patti

_____/

**OPINION AND ORDER
GRANTING IN PART AND HOLDING IN ABEYANCE IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 20)**

Plaintiff James Luca was an employee at the Social Security Administration (Agency), and he claims he was wrongly passed over for higher posts with the Agency. Luca claims he wasn't picked because of his age in violation of the Age Discrimination in Employment Act of 1967 (ADEA). He also claims that the Agency's selection procedures disadvantaged older workers in violation of the ADEA and men in violation of Title VII of the Civil Rights Act of 1964 (Title VII). And he claims that his supervisor retaliated against him in violation of both statutes.

The parties consented to me conducting all proceedings in this action, and the Agency seeks summary judgment. The Agency offers legitimate, non-

discriminatory reasons for not selecting Luca, and he cannot show those reasons are pretextual. He also cannot prove that the Agency's selection procedures had an unlawfully disparate impact on protected groups.

I shall grant the Agency's motion with respect to these claims. But it is unclear whether Luca's retaliation claim survives, so I shall reserve any ruling on the Agency's motion in remaining part, pending further briefing on that claim.

## BACKGROUND

Luca was a fifty-two-year-old customer-service representative at the Agency's Wyoming office in Detroit, Michigan. He was also a union steward for the American Federation of Government Employees, Local 3239. In early 2014 Luca's coworker alleged that the Wyoming office's supervisor, Oussama Bazzi, bullied and harassed her. (ECF Nos. 25-1, 25-2). In his role as union steward, Luca spoke with Bazzi about this issue and helped the coworker file a grievance with the union.[1] (*Id.*).

Luca wanted a change, so he applied for eight promotions at the Agency's Downtown, Grand River, Southwest, Northwest, and Wyoming offices, all in Detroit. (ECF No. 1-3, PageID.48).[2] In total, fifteen men and twenty women

---

[1] It is not clear whether Luca's involvement with his coworker's dispute with Bazzi happened before or after he was considered for any relevant positions.

[2] ECF No. 1-3, PageID.48, lists eight vacancies. An exhibit (ECF No. 22-1) that Luca attached to his earlier, since superseded response to the instant motion suggests that two of these vacancies were at the Agency's offices in Clawson and Livonia,

(including fifteen individuals who were older than forty and twenty who were younger than forty) applied for the promotions. (*Id.*). In April 2014, Luca was passed over. The Agency hired eight women and one man, all of whom were younger than forty. (*Id.*).

Around the same time Luca also applied for a job as a teleservice representative at the Agency's Teleservice Center.[3] There were ten vacancies at the Center, but he was rejected in May 2014. All ten jobs went to veterans.

Luca suspected that his age, his sex, and his involvement with his coworker's dispute with Bazzi had had something to do with these non-selections. So he filed an administrative complaint with the Agency. The Agency sent him a letter acknowledging its receipt. (ECF No. 20-23). The letter also purports to describe Luca's claims, but it's not clear that the letter includes his supporting factual allegations. The Agency then spoke with its selection officials, and they explained why they didn't pick Luca.

**Downtown Office.** Luca wasn't selected at the Downtown office because he "was not recommended." (ECF No. 20-13, PageID.425). The Downtown

---

Michigan, and not at its offices in Detroit. But neither party discusses ECF No. 22-1 in their operative filings, so ECF No. 22-1 is not part of the summary-judgment record. And I must presume (because it's better for Luca if it's true) that all eight promotions listed at ECF No. 1-3, PageID.48 were at the five Detroit offices.

[3] The Teleservice Center was also in Detroit, but I only use *Detroit office*s to refer to the Downtown, Grand River, Southwest, Northwest, and Wyoming offices.

3

selection official had spoken to Luca's supervisor, Bazzi, who said "that if [the Wyoming office] had a vacancy [he] would not promote [Luca]." (*Id.*). Luca "needed [to be] less dependent on his mentor"; "did not always apply the policy appropriately"; "had difficulty with grasping some of the information"; "needed to work on his time management"; and "had difficulty balancing his workload," Bazzi said. (*Id.*).

***Grand River Office.*** The Grand River selection official hired an applicant who "[m]et qualifications"; and whose "work ethics, reliability, work management skills," and "proficiency" she had "first-hand knowledge of." (ECF No. 20-15, PageID.442). The official additionally spoke to her manager—the Downtown selection official—about who to pick.

***Southwest Office.*** The Southwest selection official promoted an applicant who had already worked at the Southwest office for a year. The official "was familiar with [the selectee] and [the selectee's] work ethic," and the selectee "possessed the skills [the official] was looking for." (ECF No. 20-14, PageID.435). The selectee "was also fluent in Spanish." (*Id.*).

***Northwest Office.*** Personal knowledge was key at the Northwest office, too. The Northwest selection official discussed his "firsthand knowledge of [the selectee's] work and skills." (ECF No. 20-17, PageID.453). The official also said that the selectee "was highly recommended and had twice the experience in the

4

field as [Luca]." (*Id.*).

*Wyoming Office.* The Wyoming selection official was Luca's second-line supervisor, above Bazzi. Like the other selection officials, the Wyoming official had "personal knowledge of the selectee and [the selectee's] work performance." (ECF No. 20-16, PageID.447). The official also reported that Luca "was a trainee under review and had not exhibited successful completion of his training program." (*Id.*). And Luca had "consistently failed to process his workloads timely and accurately and had difficulty following processing instructions to process his cases," she said. (*Id.*).

*The Teleservice Center.* At the Teleservice Center, the selection official "consider[ed] veterans' preference first and interview[ed] all eligible veterans." (ECF No. 20-19, PageID.461). Luca wasn't interviewed. The official said that Luca "was considered," but she declined to compare him to the interviewees because he wasn't interviewed. (ECF No. 20-18, PageID.459).

When the Agency spoke to them, some of the selection officials did not still have—or never had—certain documents. At the Grand River office, "no copies" of the selectee's qualifications were "available." (ECF No. 20-15, PageID.442). The Southwest selection official couldn't "compare the skills of [the] selectee to [Luca]'s" because she "was no longer in possession of" the relevant "documentation." (ECF No. 20-14, PageID.435). Nothing "related to the filing of

5

[the] vacancy" had been "kept" at the Northwest office. (ECF No. 20-17, PageID.453). The selection official at the Wyoming office said that "[n]o substantiating documentation" regarding the selectee's qualifications "exists." (ECF No. 20-16, PageID.447). And "questions and interview notes" had not been "retain[ed]" at the Teleservice Center. (ECF No. 20-18, PageID.458).

An administrative law judge considered Luca's administrative complaint and the selection officials' explanations. He ultimately dismissed Luca's charges, and Luca appealed to the Equal Employment Opportunity Commission (EEOC). The EEOC affirmed, and this *pro se* action followed.

Luca's complaint is hard to parse,[4] but he discussed his claims at his deposition. The Agency now seeks summary judgment. The Agency focuses on the claims Luca discussed in his deposition. The Agency's motion was fully briefed, and it is axiomatic that "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). Thus, I will stick to the claims Luca discussed in his response to the Agency's motion.

Per that response, Luca brings four claims under the ADEA and Title VII.

---

[4] Luca filed a form *pro se* complaint. (ECF No. 1). He also attached to the complaint a statement describing his claims in greater detail. (ECF No. 1-1). Because documents a plaintiff attaches to a complaint form part of the complaint "for all purposes," Fed. R. Civ. P. 10(c), Luca's attached statement is part of his complaint.

6

First, he claims that the Detroit selection officials didn't promote him because of his age. Second, he claims that the Detroit offices' promotion procedure disproportionately hurt male applicants. In support, he pleaded that the Detroit selection officials formed committees that didn't promote the three most qualified candidates or conduct interviews. (Compl. 7 ¶¶ 43–45, ECF No. 1-1). Third, he claims that the Teleservice Center's preference for veterans harmed older applicants. Fourth and last, he claims that Bazzi gave a negative reference to the Downtown selection official because of his involvement with his coworker's dispute with Bazzi, and that he lost out on the Downtown and Grand River promotions as a result.

No hearing on the Agency's motion is necessary.

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And parties genuinely dispute material facts if, "taking the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, 'a reasonable jury could return a verdict for the nonmoving party.'" *DeVore v. Univ. of Ky. Bd. of Trs.*, 118 F.4th 839, 844 (6th Cir. 2024) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A defendant is entitled to summary judgment if it shows that the plaintiff cannot "establish the existence of an element essential to [the plaintiff]'s case, and on which [the plaintiff] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To do that, "the defendant's summary-judgment briefing need only show that the record lacks evidence from which 'a rational trier of fact' could find for the plaintiff on the issue." *Lemaster v. Lawrence County*, 65 F.4th 302, 309 (6th Cir. 2023).

But when a defendant seeks summary judgment on an affirmative defense, "its burden of production is greater" because it must prove the defense at trial. *Id.* at 310 (quoting 10A *Wright & Miller's Federal Practice & Procedure* § 2727.1 (4th ed. 2016)). A defendant who seeks summary judgment on an affirmative defense accordingly "must affirmatively introduce evidence of such weight that no rational jury could disagree with it." *Id.*

## ANALYSIS

Luca brings claims against a federal agency under the ADEA and Title VII. The ADEA's federal-sector provision requires "personnel actions" by federal agencies "affecting employees or applicants for employment who are at least 40 years of age" to be "made free from any discrimination based on age." 29 U.S.C. § 633a(a). And Title VII's federal-sector provision requires such actions to be "made free from any discrimination based on race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e-16(a). Both statutes are only enforceable by private action if the plaintiff exhausted available administrative remedies. *See Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 993 (6th Cir. 2009).

## I. The Detroit Selection Officials' Non-promotions

Luca claims that the Detroit selection officials didn't promote him based on his age in violation of the ADEA. The parties agree that the *McDonnell Douglas* framework applies to this disparate-treatment claim. *See, e.g.*, *See Briggs v. Potter*, 463 F.3d 507, 514–17 (6th Cir. 2006) (applying *McDonnell Douglas* to a federal-sector ADEA claim).

*McDonnell Douglas* has three steps. First, Luca must make out a *prima facie* claim. *See id.* at 514. Second, the burden shifts to the Agency "to articulate a legitimate, nondiscriminatory reason for the" non-promotions. *Id.* Last, "the burden shifts back to [Luca], who must establish that the legitimate reasons offered by the [Administration] were just a pretext for decisions actually motivated by an unlawful bias against age." *Id.* (quoting *Rowan v. Lockheed Martin Energy Sys.*, 360 F.3d 544, 547 (6th Cir. 2004)).

Even if Luca makes out a *prima facie* claim, the Detroit selection officials had good reasons not to promote him. Luca hadn't worked with the officials directly, while the selectees had. He didn't speak Spanish. The selectees had good work ethic, extensive experience, and good reviews from their supervisors. Luca's

9

supervisor, Bazzi, gave him a bad review. And the hiring official at the Wyoming office personally knew that Luca wasn't up to the task. These reasons are not only good; they are legitimate and non-discriminatory.

Luca disagrees for three reasons, none of which are persuasive.

### A. Prohibited Personnel Practice

First, Luca argues that the Grand River, Southwest, Northwest, and Wyoming selection officials displayed improper "favoritism," or "familiarity," towards their selectees. (ECF No. 25, PageID.586, 589). According to him, favoritism counts as a prohibited personnel practice under 5 U.S.C. § 2302(b)(6). Section 2302(b)(6) prohibits federal agencies from "grant[ing] any preference or advantage not authorized by law, rule, or regulation to any . . . applicant for employment . . . for the purpose of improving or injuring the prospects of any particular person for employment." § 2302(b)(6).

Luca's reliance on § 2302(b)(6) is misplaced. Even if the Grand River, Southwest, Northwest, and Wyoming selection officials showed favoritism and § 2302(b)(6) prohibits favoritism, favoritism is not necessarily aged-based discrimination. And Luca offers nothing showing that the officials' favoritism stemmed from age-based animus. *Accord Holder v. City of Raleigh*, 867 F.2d 823, 826 (4th Cir. 1989); *Schobert v. Ill. Dep't of Transp.*, 204 F.3d 725, 733 (7th Cir. 2002); *Ladenberger Plymouth-Canton Cmty. Schs.*, No. 16-14170, 2018 WL

10

3914709, at *5–9 (E.D. Mich. Aug. 16, 2018).

### B. Recordkeeping

Second, Luca says that the Southwest, Northwest, and Wyoming selection officials violated part 1602.14 of title 29 of the *Code of Federal Regulations*, which implements Title VII's recordkeeping requirement. 29 C.F.R. § 1602.14 (2024). Part 1602.14 requires employers to keep certain records "for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later." *Id.* And if "a charge of discrimination has been filed," then part 1602.14 requires an employer to keep relevant records until the charge is resolved. *Id.*

As a preliminary matter, part 1602.14 is inapposite because Luca brings his disparate-treatment claims under the ADEA, and the ADEA also has its own recordkeeping requirement: part 1627.3 of title 29 of the *Code of Federal Regulations*. 29 C.F.R. § 1627.3 (2024). Part 1627.3 also requires employers to keep records for at least one year and, if a charge of discrimination is filed, until the charge is resolved. *See id.* The Agency does not dispute that part 1627.3 is materially identical to 1602.14.

The Agency also doesn't dispute that the Southwest, Northwest, and Wyoming selection officials didn't preserve records as required by parts 1602.14 and 1627.3. Instead, the Agency argues that Luca would not be entitled to an

adverse-inference instruction at trial, *i.e.*, an instruction that the jury may presume unavailable records contained evidence of discrimination.

But Luca doesn't seek an adverse inference *per se*. Rather, he argues that the selection officials' failures to preserve records casts doubt on their credibility. And if the officials aren't credible, then the Agency can't discharge its burden at step two of *McDonnell Douglas*. His theory is this, in essence: "Honest people follow the rules, and dishonest ones don't."

Courts can't resolve credibility issues on summary judgment. That's the jury's job. *Anderson*, 477 U.S. at 255. But the question remains whether the officials' conduct undermines their credibility, or whether Luca is grasping at straws to avoid summary judgment. In the Court's view, it's the latter. Nothing about an official's failure to follow a recordkeeping rule necessarily, or even likely, makes them a liar.

And even if Luca seeks an adverse inference, he fares no better. *Grosdidier v. Broadcasting Board of Governors*, 709 F.3d 19 (D.C. Cir. 2013), is instructive. There, the D.C. Circuit "recognized the negative evidentiary inference arising from *spoliation* of records" in a Title VII employment-discrimination case. *Id.* at 27 (emphasis added). But the Southwest office selection official said only that she didn't *possess* certain records. And the Wyoming selection official said that the relevant records did not *exist*. Neither of these statements show, with enough

12

clarity to entitle Luca to an adverse-inference instruction, that relevant records were *spoliated*, *i.e.*, destroyed, mutilated, altered or concealed. *Spoliation*, *Black's Law Dictionary* (12th ed. 2024).

The non-promotion at the Northwest office is a closer call, because the Northwest selection official stated that records had not been *kept*. This implies destruction. Per *Grosdidier*, Luca would be entitled to an adverse-inference instruction. That is true because he is a member of the class protected by the ADEA and the records likely contained relevant evidence. *See id.* at 27–28. Considering the officials' other statements, however—that the selectee was skillful and had twice Luca's experience—any adverse inference "would not permit a reasonable finding that the destroyed [records] would have established pretext, let alone unlawful discrimination." *Id.* at 28–29.

### C. Plain Superiority

Third, Luca says that he was plainly superior to the other candidates. In the right circumstances, a rejected applicant's plain superiority to a selectee for a promotion can show pretext under *McDonnell Douglas*. *See, e.g.*, *Bartlett v. Gates*, 421 F. App'x 485, 490–91 (6th Cir. 2010). But Luca solely relies on a document describing the Downtown vacancies and listing applicants' names. (ECF No. 20-6, PageID.231–42). That is woefully inadequate.

No reasonable jury would find that the Detroit selection officials

intentionally discriminated against Luca based on his age, there being no admissible evidence of pretext to challenge the legitimate reasons given for hiring other people.[5]

## II. The Detroit Offices' Promotion Procedure

Luca also claims that the Detroit offices' promotion procedure had an unlawfully disparate impact on men in violation of Title VII. Like the ADEA, Title VII prohibits intentional discrimination. *See Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007). Title VII also prohibits "employment practices that are 'fair in form but discriminatory in operation.'" *Phillips v. Cohen*, 400 F.3d 388, 397 (6th Cir. 2005) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Agency argues that Luca failed to exhaust this claim and that it fails on the merits.

### A. Failure to Exhaust

Failure to exhaust under Title VII's federal-sector provision is an affirmative defense. *Rembisz v. Law*, 590 F. App'x 501, 503–04 (6th Cir. 2014). Here, the Agency concedes that Luca exhausted a disparate-*treatment* claim that he brings under Title VII. Although Luca's disparate-treatment claim arises under the ADEA, the Agency effectively agrees that Luca's administrative proceedings were

---

[5] If Luca claimed that the Detroit selection officials didn't promote him based on his membership in a class protected by Title VII, *McDonnell Douglas* would apply to that claim, too. *See, e.g., Tepper v. Potter*, 505 F.3d 508, 515–16 (6th Cir. 2007). And that claim would fail for the reasons discussed in Part I.

14

exhaustive for any Title VII claims that proceeding embraced. And the parties dispute whether Luca's disparate-*impact* challenge to the Detroit offices' promotion procedure was part of that proceeding.

Where, as here, a defendant argues that an administrative proceeding which would otherwise have been exhaustive under Title VII nevertheless did not exhaust a certain Title VII claim, the "expected scope of investigation test" controls.[6] *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 380 (6th Cir. 2002)). Under that test, any claim that the EEOC reasonably would have investigated based on the facts the plaintiff alleged is exhausted. *See id.* Thus, the Agency must prove that Luca never alleged such facts for his challenge to the Detroit offices' promotion procedure.

The Agency falls short. It solely relies on its letter acknowledging its receipt of Luca's administrative complaint. (ECF No. 20-23). But construed in the light most favorable to Luca, that letter only details his *claims*, and not the facts he alleged in support. And neither Luca's administrative complaint nor any documents he filed with the EEOC are in the summary-judgment record. The Agency cannot satisfy the reasonable-scope-of-investigation test.

---

[6] The expected-scope-of-investigation test would not necessarily control whether Luca exhausted any ADEA claims because "the ADEA does not explicitly require a plaintiff to exhaust administrative remedies before bringing suit." *McKnight v. Gates*, 282 F. App'x 394, 397 (6th Cir. 2008). An ADEA plaintiff need only notify the EEOC that he intends to bring suit. *See Hunter*, 565 F.3d at 993.

The Agency also points to Luca's civil complaint in this case, which alleges that the EEOC never addressed some of his claims. The Agency infers that the EEOC ignored some of his claims because he never raised them in the first place. But all reasonable inferences must be drawn in Luca's favor, and therefore a reasonable jury could infer that the EEOC *ignored* some of his claims.

In sum, not every reasonable jury would find that Luca failed to exhaust his Title VII disparate-impact challenge to the Detroit offices' promotion procedure.

**B. On the Merits**

To prevail on his disparate-impact challenge to the Detroit offices' promotion procedure, Luca "must identify employment practices challenged and show their disparate impact on [men]." *Phillips*, 400 F.3d at 397. He pleaded that the Detroit selection officials formed committees, and that those committees did not make promotions from among the top three candidates and did not conduct interviews. But the undisputed, admissible evidence of record shows that the Detroit selection officials did the promoting, and not any committee. (ECF Nos. 20-13 to 20-19). As such, no reasonable jury would find that the Detroit offices' promotion procedure discriminated based on sex.[7]

---

[7] If Luca claimed that the Detroit offices' promotion procedure disparately impacted another class protected by Title VII to which he belongs, that claim would fail for the reasons discussed in Part II.B. And, if Luca claimed that the Detroit offices' promotion procedure disproportionately harmed older applicants in violation of the ADEA, that claim would also fail for the reasons discussed in Part II.B. *See Smith v.*

16

### III. The Teleservice Center's Preference for Veterans

Luca claims that the Teleservice Center's preference for veterans unlawfully disadvantaged older workers. To prevail, he must: (1) "identify[] the specific employment practice that is challenged"; (2) show a disparity; and (3) connect the practice to the disparity. *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 656 (1989) (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)); *see also Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (holding that *Wards Cove* governs disparate-impact claims under the ADEA's federal-sector provisions).

Luca identifies a specific employment practice: a preference for veterans. To show that this practice caused a disparity, he can compare "the [age] composition of the qualified persons in the labor market" to "the persons holding at-issue jobs." *Wards Cove*, 490 U.S. at 650. Alternatively, if "labor market statistics will be difficult if not impossible to ascertain," then he may, for example, offer some "measure[] indicating the [age] composition of 'otherwise-qualified applicants' for at-issue jobs." *Id.* at 651 (quoting *N.Y.C. Transit Auth. v. Beazer*,

---

*City of Jackson*, 544 U.S. 228, 241 (2005) (holding that under the ADEA, "the employee is 'responsible for isolating and identifying the *specific* employment practices that'" allegedly had a disparate impact" (quoting *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 656 (1989))).

Even if Luca could prove that the Detroit selection officials used a specific employment practice, he still fails to put forward data necessary to prove that the policy disparately impacted older workers or a class protected by Title VII for the reasons discussed in Part III.

17

440 U.S. 568, 585 (1979)).

Luca's proofs are woefully insufficient. He relies solely on the fact that the Teleservice Center didn't hire any non-veterans for the ten vacancies. He infers that the Center's veteran-preference policy discriminated based on age because he was older than forty and wasn't selected for any of the ten positions. But he offers nothing showing that the ten positions went to individuals younger than forty. And even if all ten jobs went to individuals younger than forty, that still wouldn't be good enough. He needs data about the larger job market, and he offers none.[8]

No reasonable jury would find that the Teleservice Center's preference for discriminated based on age.[9]

---

[8] Luca also argues that the Teleservice Center's selection official failed to preserve records. It's not clear what he believes this adds to the disparate-impact calculus. All agree that the Teleservice Center's official preferred to hire veterans.

[9] If Luca claimed that the Teleservice Center's preference for hiring veterans disparately impacted a class protected by Title VII to which he belongs, that claim would also fail for lack of statistical support. *See Phillips*, 400 F.3d at 399. If Luca claimed that the Teleservice Center's preference for hiring veterans had a disparate impact on non-veterans, that claim would fail too because neither the ADEA nor Title VII protects non-veterans. *See* §§ 633a(a); 2000e-16(a). And if Luca claimed that the Teleservice Center's selection official intentionally discriminated against him based on his age or membership in a class protected by Title VII, *McDonnell Douglas* would control. *See id.* (Title VII); *Briggs*, 463 F.3d at 514 (ADEA). But a preference for veterans is legitimate and non-discriminatory, and Luca couldn't show pretext. Indeed, the law *requires* federal agencies to give preference to veterans for many jobs. *See* 5 U.S.C. § 3301 note (Executive Orders). Luca would likely disagree. He says that the Teleservice Center's official failed to preserve records. But that argument would fail for the reasons detailed *supra,* Part I.B.

18

## IV. Retaliation Claim

Last, Luca brings a retaliation claim. He claims that Bazzi gave a negative reference to the Downtown selection official, who in turn spoke with the Grand River selection official, and that he lost out on the Downtown and Grand River promotions as a result. And he claims that Bazzi only gave him a negative reference because he had gotten involved in Bazzi's dispute with the coworker, which stemmed from his duties as a union steward.

The Agency argues that Luca cannot prove that the Detroit offices failed to promote him in retaliation for his past ADEA and Title VII activity. But that's not what Luca claims; he claims that *Bazzi's negative reference* was retaliatory.[10] He *seeks damages* for that reference because, he says, he otherwise would have been promoted at the Downtown and Grand River offices. Given the scattershot nature of the pleadings, I will permit the Agency to address this claim and permit Luca to respond. *See* Fed. R. Civ. P. 56(e)(1).

---

[10] The only other selection official who arguably knew about Luca's involvement with the coworker's and Bazzi's dispute was the Wyoming selection official, because she was Luca's second-line supervisor. If Luca claimed that his non-promotion at the Wyoming office was in retaliation for that conduct, then *McDonnell Douglas* would apply. *See, e.g.*, *Kaminsky v. Wilkie*, 856 F. App'x 602, 607 (6th Cir. 2021) (ADEA); *Taylor v. Geithner*, 703 F.3d 328, 335–40 (6th Cir. 2013) (Title VII). And that claim would fail at step two because the Wyoming official's reasons for not promoting him—that the selectee was a good worker and Luca wasn't—were legitimate and non-discriminatory, and Luca couldn't show pretext for the reasons discussed in Part I.

## CONCLUSION & ORDER

All Luca's claims, except his retaliation claim in connection with Bazzi's negative reference, fail as briefed. Accordingly, **IT IS ORDERED** that the Agency's motion (ECF No. 20) is **GRANTED**, except to the extent that it seeks summary judgment on Luca's retaliation claim. That portion of the motion is **HELD IN ABEYANCE**, pending supplemental, expedited briefing.

**IT IS FURTHER ORDERED** that:

(1) The Agency shall, **on or before SEPTEMBER 5, 2025**, file a brief of no more than **seven pages** addressing **only** Luca's retaliation claim;

(2) Luca shall, **within two weeks** of the filing of the Agency's brief, file a response brief of no more than **seven pages** addressing **only** the Agency brief; and

(3) The Agency may, **within three business days** of the filing of Luca's response brief, file a reply brief of no more than **three pages** addressing **only** Luca's response.

**IT IS SO ORDERED**.

Dated: August 26, 2025

Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE