# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JAMES LUCA,

       Plaintiff,

v.

                                       Case No. 2:23-cv-11966
                                       Magistrate Judge Anthony P. Patti

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

_____/

## OPINION & ORDER
## GRANTING IN PART AND DENYING IN REMAINING PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 20)

Plaintiff worked for the Social Security Administration ("Agency"). His supervisor gave him a negative reference after he helped a coworker filed a grievance against the supervisor. He now sues the Agency, alleging that title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA") prohibited it from retaliating against him based on him having helped the coworker file the grievance. Specifically, both statutes prohibited the Agency from retaliating against Luca for "opposing" discrimination or "participating" in a statutory proceeding.

Luca did not reasonably believe that his coworker alleged discrimination by the supervisor in the grievance proceeding, so he did not "oppose" discrimination

under Title VII or the ADEA.  But it is unclear whether the coworker's grievance proceeding was a proceeding under Title VII or the ADEA, and therefore it is unclear whether Luca "participated" in a statutory proceeding.  The Court accordingly shall grant the Agency's motion to the extent that it seeks summary judgment on Luca's retaliation claims under Title VII's and ADEA's opposition clauses and shall deny the motion in remaining part.

## BACKGROUND

Plaintiff James Luca was a customer-service representative at the Agency's Wyoming office in Detroit, Michigan.  He was also a union steward for the American Federation of Government Employees ("AFGE").  The Wyoming office's supervisor was Oussama Bazzi.  In 2014 Luca's coworker at the office, Julie Wilkins, alleged that Bazzi had bullied and harassed her on February 18, 2014.  On March 7, 2014, Luca wrote a letter to the Agency informing it that Wilkins was filing a grievance against Bazzi under the AFGE's collective-bargaining agreement with the Agency. (*See* ECF No. 25-2, PageID.609).  Luca's letter does not discuss Wilkins's claims; it says only that she is filing a grievance.

Wilkins's grievance alleges that Bazzi repeatedly chastised her about her job performance.  Her job included interviewing Social Security benefits claimants, and her grievance states that Bazzi constantly reprimands her for conducting what he thinks are unduly lengthy interviews with benefits claimants:

This is a grievance concerning a continued practice of bullying and harassment for acts that have taken place on several occasions with several office employees. Office staff members are constantly hindered in performance of their duties over their concerns that [Bazzi] will initially or again unjustly critique, bully, harass, and humiliate them to modify behavior. . . .

[Wilkins] has experienced prior incidents of private meetings and threats during FY 2013 and 2014. [Bazzi's] constant criticism has created a hostile work environment . . . .

On February 27, 2013, . . . [Wilkins] discovered [that] the applicant claimant was given the wrong information. Per protocol, [she] sought assistance from a Technical Expert to obtain and provide the correct information to the customer. [Bazzi] told [her] not to go to the Technical Expert. [Bazzi] is abusing power to emphasize interview cycle-time over quality of service. . . .
. . . .

On February 18, 2014, . . . [Bazzi] approached [Wilkins] while [she was] still in an interview to question if the content of the interview pertained to a family, and upon a negative response, [Bazzi] blatantly expressed facial cues of disgust on the length of time [she] took to conduct the interview. Unwarranted and invalid criticism is an example of bullying. . . .

(ECF No. 25-1, PageID.605).

Around the same time that Luca helped Wilkins file this grievance, he applied for a promotion at the Agency's Downtown office, also in Detroit. To assess Luca's qualifications for that role, Bazzi in April 2014 filled out a questionnaire assessing Luca's workplace performance.

Bazzi's questionnaire positively describes Luca's "Leave/Dependability": "No[] problems with leave. Schedules his leave in advance. He is dependable,

only remember him calling in once within the last year and a half."  (ECF No. 20-13, PageID.430).  The questionnaire also recounts that Luca has good "Interpersonal Skills":

> He gets along well with his peers. There has [sic] been no issues on the floor with his peers. It is rare that someone files a complaint against him or that he needs Supervisor intervention. He does listen to feedback and is flexible. He doesn't complain when he is pulled off adjudication to interview.

(*Id.*).  The questionnaire additionally describes Luca's "[d]ependability, flexibility," and ability "to get along with his co-workers" as strengths.  (*Id.*).  And the questionnaire records that he has no "Disciplinary Actions."  (*Id.*).

But the questionnaire states that Luca's "Technical Ability/Job Knowledge/ Ability to Research Policy" are poor: "He has a mentor and is epad.  He needs . . . reassurance [from his mentor,] over analyze[s] [and] read[s] too much into policy, does not always apply policy appropriately, . . . [and has] difficulty with grasping [policy]."  (*Id.*).  The term "epad" (stylized as "ePAD") refers to the Agency's training program.  The questionnaire also lists a few "Weaknesses": "Needs to be less depended [sic] on his mentor.  Interpreting policy, time management and work load management.  Difficulty balancing working[.]"  (*Id.*).

The questionnaire concludes with the question "If you had a vacancy would you select him/her?" followed by the words "YES" and "NO."  (*Id.* at 431).  Bazzi marked an "X" next to the word "NO."  (*Id.*).

Later in April 2014 Luca was not selected for the promotions at the Downtown or Grand River offices.  The Downtown selection official stated that he had relied on Bazzi's questionnaire:

> [Luca] was not recommended and it was stated [by Bazzi] that if [Bazzi] had a vacancy in [the Wyoming] office [Bazzi] would not promote him at the that time; we were told that he needed to be less dependent on his mentor; he did not always apply the policy appropriately; he had difficulty with grasping some of the information; and he needed to work on his time management skills; workload management skills; and that he had difficulty balancing his workload.

(Tash Aff. ¶ 31, ECF No. 20-13).  From this, Luca infers that Bazzi's negative reference caused him to lose out on the Downtown promotion.[1]

Luca later applied for another promotion within the Agency at a different office in Detroit.  The Agency again asked his supervisor to assess his work performance, and this time the review was more positive.[2]  An October 2014 email between two Agency employees states that Luca's "supervisor have him a 4 [out of 5] on verbal and written communication skills, interpersonal skills, and completing tasks accurately, timely, and independently."  (ECF No. 25-4, PageID.618).  The

---

[1] Luca in early 2014 also applied for a promotion at the Agency's Grand River office in Detroit. In April 2014 he was not selected for that promotion, either. And the Grand River selection official stated that the Downtown selection official had "consulted" with her "about the vacancy" at the Grand River office. (Anthony Aff. ¶ 21, ECF No. 20-15). Luca concludes that the Downtown official told the Grand River official about Bazzi's reference, and therefore that Bazzi's reference caused him to lose out on the Grand River promotion, too.

[2] Luca says that the supervisor whom this email discusses is Bazzi.

email records that Luca's supervisor had also "assessed [him] as a 5 in terms of ability to handle sensitive situations and manage his own leave." (*Id.*). And the email details that Luca "scored by far the highest on his interview" for the promotion, "earning 25 out of a possible 27 points." (*Id.*).

This *pro se* action against the Agency followed.[3] Luca alleged that Bazzi gave the negative reference for the Downtown promotion in retaliation for him having helped Wilkins with her grievance against him. And Luca claimed, among other things, that Bazzi's negative reference amounted to retaliation prohibited by Title VII and the ADEA.

The parties consented to my jurisdiction over this action, and the Agency sought summary judgment. I granted the Agency's motion with respect to all Luca's claims except his retaliation claim, and I ordered supplemental briefing on that claim. That briefing has now concluded, and no hearing is necessary.

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine

---

[3] This is one of four lawsuits he has brought in this Court in the past three years against the Agency related to his employment. *See Luca v. Comm'r of Soc. Sec.*, No. 4:22-cv-11169, 2024 WL 4340706 (E.D. Mich. Sept. 27, 2024), *aff'd*, No. 24-2039, 2025 U.S. App. LEXIS 23044, at *12 (6th Cir. Sept. 5, 2025) ("[T]he evidence is nearly overwhelming that Luca's abuse of the [Agency]'s leave policies was the sole reason for its termination decision."); *Luca v. Kijakazi*, No. 4:22-cv-12001 (E.D. Mich. Sept. 29, 2023); *Luca v. Comm'r of Soc. Sec.*, 2:23-cv-12393, 2025 WL 2463150 (E.D. Mich. filed Sept. 20. 2023).

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And parties genuinely dispute material facts if, "taking the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, 'a reasonable jury could return a verdict for the nonmoving party.'" *DeVore v. Univ. of Ky. Bd. of Trs.*, 118 F.4th 839, 844 (6th Cir. 2024) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

If the movant discharges this burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts" to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant "must come forward with specific facts showing that there is a *genuine issue for trial.*" *Id.* at 587 (citation modified).

## ANALYSIS

The parties agree that the three-step *McDonnell Douglas* framework applies to Luca's retaliation claims.[4] *Accord Hunter v. Sec'y of U.S. Army*, 565 F.3d 986,

---

[4] Neither Title VII nor the ADEA explicitly prohibit discrimination by federal agencies. *See* 42 U.S.C. § 2000e-16(a) (Title VII); 29 U.S.C. § 633a(a) (ADEA). But the law of this Circuit recognizes that individuals may sue federal agencies for retaliation prohibited by the statutes' private-sector provisions. *See, e.g.*, *Taylor v. Geithner*, 703 F.3d 328, 335–36 (6th Cir. 2013) (Title VII); *Kaminsky v. Wilkie*, 856 F. App'x 602, 607 (6th Cir. 2021) (ADEA); *see also Gomez-Perez v. Potter*, 553 U.S. 474 (2008) (recognizing that retaliation claims are available under the ADEA's federal-sector provision). *See generally* 42 U.S.C. § 2000e-3(a) (Title VII's retaliation provision); 29 U.S.C. § 623(d) (ADEA's retaliation provision).

995–96 (6th Cir. 2009) (Title VII); *Scott v. Potter*, 182 F. App'x 521, 523–25 (6th Cir. 2006) (ADEA). Under *McDonnell Douglas*, Luca must first make out a *prima facie* claim. *Hunter*, 565 F.3d at 995–96. Then, the burden shifts to the Agency "to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Id.* at 996 (quoting *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990) (per curiam)). Last, the burden shifts back to Luca, who "must demonstrate 'that the [Agency's] proffered reason was not the true reason for the employment decision.'" *Id.* (quoting *Canitia*, 903 F.2d at 1066).

## I.    *Prima Facie* Claim

To make out a *prima facie* retaliation claim, Luca must prove that: (1) "[he] engaged in activity protected by Title VII" or the ADEA; (2) his "exercise of protected rights was known to" the Agency; (3) the Agency "thereafter took adverse employment action against" him; and (4) "there was a causal connection between the protected activity and the adverse employment action." *Hunter*, 565 F.3d at 996 (alteration in original) (quoting *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000)). The Agency does not dispute that Bazzi's negative reference was an adverse employment action, but it maintains that Luca cannot prove the other elements of his *prima facie* claim.

### A.    Protected Conduct

Title VII's and the ADEA's anti-retaliation provisions protected Luca's

8

conduct if their "opposition" or "participation" clauses applied to the conduct. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578–79 (6th Cir. 2000) (addressing Title VII); *see Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (explaining that "cases construing Title VII" are "a source of authority for interpreting the ADEA's anti-retaliation clause"). Luca invokes both statutes' participation and opposition clauses.

### i.    The Opposition Clauses

Title VII's opposition clause prohibits retaliating against an individual "because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). And the ADEA's opposition clause works the same way, except that the individual must have opposed age discrimination. *See* 29 U.S.C. § 623(d) (prohibiting discriminating against an individual because he "has opposed any practice made unlawful by" the ADEA).

The opposition clauses protect "oppos[ition to] any practice that the employee reasonably believes to be a violation of Title VII" or the ADEA." *Johnson*, 215 F.3d at 579. "[T]he operative question is not whether [the opposed] conduct was actually unlawful, but whether [the individual opposing the conduct] held an objectively reasonable and good faith belief to that effect." *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 512 (6th Cir. 2016).

The individual must also put the employer on notice that he is opposing

discrimination.  *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1311–14 (6th Cir. 1989).  To that end, "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice."  *Id.* at 1313.

Assuming, *arguendo*, that helping a coworker file a grievance under a collective bargaining agreement between a federal agency and a union may qualify as opposing discrimination, the opposition clauses protected Luca's conduct if he reasonably and subjectively believed that Bazzi had discriminated against Wilkins based on her race, color, religion, sex, national origin or age.  But Luca does not explain why he believed—reasonably or otherwise—that Bazzi had discriminated against Wilkins.

Nor does Luca offer anything showing that the Agency was on notice that he was opposing discrimination.  The only proof he offers is an excerpt of the letter he sent the Agency on March 7, 2014, but that letter states only that Wilkins is filing a grievance against the Agency and does not discuss her claims against Bazzi.  (*See* ECF No. 25-2, PageID.609.)  Luca's letter is at most a vague charge of discrimination in an internal letter or memorandum, which is not sufficient.[5]

---

[5] Luca also offers a December 2015 affidavit from Bazzi where Bazzi admitted that he knew Luca "has prior EEO activity." (Bazzi Aff. ¶ 15, ECF No. 25-3.)  But Luca offers nothing showing that the "prior EEO activity" to which Bazzi referred was Luca's involvement with Wilkins's grievance proceeding.

Luca apparently believes that if his conduct was protected under the *participation* clauses, then it was necessarily protected under the opposition clauses. (And he also says that his conduct was protected under the participation clauses.) But that is not the case; the opposition clauses only help Luca if he reasonably and subjectively believed he was opposing discrimination and put the Agency on notice of such opposition. Luca offers nothing from which a reasonable factfinder could find for him on these issues at trial, so his opposition-clause claims fail.

### ii.      The Participation Clauses

Title VII's participation clause prohibits retaliating against an individual "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a). The ADEA's opposition clause works the same way, except that the individual must have participated in an ADEA proceeding. *See* 29 U.S.C. § 623(d) (prohibiting retaliating against an individual because he "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under" the ADEA).

The Agency does not dispute that Luca "assisted" Wilkins in filing a grievance against Bazzi. Thus, Title VII's or the ADEA's participation clauses protected Luca's conduct if the filing of Wilkins's grievance under the AFGE's

collective bargaining agreement with the Agency qualified as an investigation, proceeding, or hearing under Title VII or the ADEA.

The Sixth Circuit has seemingly not addressed in any published opinion whether the participation clauses protect filing a grievance under a negotiated grievance procedure.  The Sixth Circuit has, however, recognized that "Title VII protects an employee's participation in an employer's internal investigation into allegations of unlawful discrimination where that investigation occurs pursuant to a pending EEOC charge." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 543 (6th Cir. 2003).  And the Sixth Circuit in *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304 (6th Cir. 1989), held that the "protection" afforded by the participation clauses is not lost if the employee is wrong on the merits of the charge, nor is protection lost if the contents of the charge are malicious and defamatory as well as wrong." *Id.* at 1312 (citation omitted).

This suggests that an individual's participation in a grievance proceeding is protected if the proceeding concerned misconduct that is also pending before the EEOC, regardless of whether the grievance or the EEOC charge alleged conduct that, as a matter of law, violates Title VII or the ADEA.[6]  But it is unclear whether

---

[6] A Sixth Circuit panel in *Johnson v. University of Cincinnati*, 215 F.3d at 561, arguably suggested that a person's reasonable belief that some activity was discriminatory matters under Title VII's participation clause. *See id.* at 581–82. If that is the case, then Luca's participation-clause claims fail for the same reasons as his opposition-clause claims. But district courts in this Circuit have rejected this

Wilkins filed an EEOC charge against Bazzi for the conduct she alleged in her grievance.

It is also unclear whether Wilkins *could* have filed such a charge with the EEOC.  If the AFGE's negotiated grievance procedure permitted her to allege discrimination, then she could have alleged discrimination by Bazzi before the union or the EEOC, "but not both."  29 C.F.R. § 1614.301(a) (2025).  Yet in that situation, she could have appealed a final decision by the Agency, an arbitrator, or the Federal Labor Relations Authority on her grievance to the EEOC.[7]  *Id.* § 1614.401(d).  And if she did that, then her filing of such appeal would ostensibly have been protected regardless of whether her grievance concerned cognizable discrimination.

This suggests that an individual's appeal to the EEOC of a final decision in a

---

reading of *Johnson*. *See, e.g.*, *Ayala v. Summit Constructors, Inc.*, 788 F. Supp. 2d 703, 720 (M.D. Tenn. 2011). And even if *Johnson* imputed a reasonable-relief requirement onto the participation clauses, that would conflict with the Sixth Circuit's earlier, published opinion in *Booker*. *See* ("[A] later panel of the [Sixth Circuit] cannot overrule the published decision of a prior panel . . . in the absence of en banc review or an intervening opinion on point by the Supreme Court." *United States v. Lee*, 793 F.3d 680, 684 (6th Cir. 2015).

[7] An exception would have applied if the Merit Systems Protection Board ("MSPB") had concurrent jurisdiction with the EEOC over the matter raised in Wilkins's grievance. In that situation, Wilkins would have had to appeal a final decision on her grievance to the MSPB. *See* § 1614.401(d); *see also* 29 C.F.R. § 1201.155(a)(1) (2025). But she could have petitioned the EEOC to review the MSPB's decision. *See* 5 U.S.C. § 7702(b).

negotiated grievance proceeding is protected regardless of whether the grievance

alleged cognizable discrimination.  But it is unclear whether the AFGE's

negotiated grievance procedure permitted Wilkins to allege discrimination and, if

so, whether she ever appealed the final decision on her grievance to the EEOC.

It is also possible that whenever a final decision on a grievance under a

negotiated grievance procedure may be appealed to the EEOC, then the filing of

such a grievance is always protected regardless of whether the grievance alleges

actionable discrimination or the grievant files such an appeal.[8]  That would make

sense if the same rule which courts apply to EEOC charges—that the merits of the

charge do not matter—also apply to grievances which could be appealed to the

EEOC, and if the fact that a grievance *may* be appealed to the EEOC makes a

grievance proceeding a protected proceeding under Title VII or the ADEA.  But

the Agency does not address these issues.

The Agency instead argues that the participation clauses did not protect

Luca's conduct "because [Wilkins's] grievance did not allege discrimination."

---

[8] This appears to be Luca's position, and he cites *Janice M. Anderson*, EEOC
Decision No. 01954805, 1996 WL 242400 (May 6, 1996), in support. There, the
EEOC held that Title VII's participation clause protected the complainant's "fil[ing]
[of] an informal grievance . . . regarding an incident of alleged sexual harassment."
*Anderson*, 1996 WL 242400, at *3. But it is unclear whether the EEOC held as much
because the complainant's grievance alleged sexual harassment, was appealable to
the EEOC, or both. It is also unclear whether the Court ought to apply *Anderson* in
any event. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 639 (2024) (overruling
the *Chevron* doctrine).

(ECF No. 30, PageID.662).  In support, the Agency points to *Batuyong v. Gates*, 337 F. App'x 451 (6th Cir. 2009).  There, the Sixth Circuit held that an employer whom the plaintiff alleged had treated her differently after she had filed grievances against it was entitled to summary judgment on the plaintiff's retaliation claims because she had "presented no evidence that any of her grievances . . . were related to race discrimination."  *Id.* at 456.

*Batuyong* effectively held that the plaintiff could not rely on the opposition or the participation clauses unless her grievances were related to discrimination prohibited by Title VII.  But *Batuyong* does not explain how it reached this conclusion for the participation clause.  And *Batuyong* arguably conflicts with the "reasonable belief" requirement for Title VII's opposition clause.  In any event, *Batuyong* is unpublished.

The Agency also argued for the first time in its reply brief that "[a] union grievance is not a Title VII proceeding."  (ECF No. 32, PageID.682.)  This suggests that the Agency believes a grievance proceeding is *never* protected under the participation clauses.  In support, the Agency again cites *Batuyong*.  But *Batuyong* cuts against the Agency, insofar as *Batuyong* arguably recognizes that the plaintiff's participation in the grievance proceeding would have been protected if it had concerned discrimination. And, again, *Batuyong* is unpublished.

Without evidence about whether the AFGE's negotiated grievance

15

procedure permitted Wilkins to allege discrimination, the outcome of her grievance proceeding, whether she appealed any final decision on her grievance to the EEOC, or additional caselaw showing that such proofs would not affect the outcome at trial, the Agency fails to show that the trier of fact cannot reasonably find that Luca's conduct was protected under the participation clauses.

### B.    Knowledge and Causal Connection

The Agency also argues that Luca cannot prove that Bazzi knew he had helped Wilkins with her grievance before Bazzi gave him the negative reference, or that Luca's assistance to Wilkins was causally connected to the negative reference.  Luca cannot prove these things, the Agency says, because he cannot prove that he helped Wilkins before Bazzi gave the negative reference.  But Luca wrote to the Agency regarding Wilkins's grievance a month before Bazzi gave him the negative reference.  (*See* ECF No. 25-2, PageID.609).

In sum, a reasonable factfinder could find that the Agency, through Bazzi, retaliated against Luca for participating in a Title VII or ADEA proceeding.  Luca accordingly can make out a *prima facie* claim for retaliation under the participation clauses.  But Luca's claims under the opposition clauses fail on their face.

## II.    Steps Two and Three of *McDonnell Douglas*

The Agency also argues that even if Luca makes out a *prima facie* retaliation claim, Bazzi had a legitimate, nondiscriminatory reasons for giving the reference,

namely, that the statements in the questionnaire were true, and therefore that Bazzi

justifiably communicated them to the Grand River selection official.  To discharge

its burden at step two of *McDonnell Douglas*, then, the Agency must come forward

with evidence substantiating Bazzi's statements about Luca's job performance.

If the Agency discharges its burden, then Luca must prove that the reason

the Agency gives for Bazzi's negative reference—that Luca was a subpar

worker—is merely pretextual.  Luca can do that by proving that his job

performance did not fit Bazzi's description; that his work performance "did not

actually motivate" Bazzi's reference; or that his work performance did not

"warrant" Bazzi's statements.  *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th

Cir. 2000).

The Agency fails to discharge its burden.  It solely relies on Luca's

deposition testimony, where he stated that he was a trainee in 2014.  (*See* Luca

Dep. 11:16–13:8, ECF No. 20-2).  That Luca was a trainee substantiates "Bazzi's

reference to [him] being on a training plan and rely[ing] on his mentor," the

Agency says.  (ECF No. 30, PageID.665).  The Agency concludes that "Bazzi's

decision not to recommend him" was justified.  (*Id.*).

What the Agency means by Bazzi "not recommending" Luca is unclear.

Bazzi filled out a questionnaire disparaging Luca's work performance.  This

conduct is the adverse employment action in this case.  And the questionnaire goes

much further than stating that Luca is a trainee who relied on his mentor; the questionnaire also says that Luca wrongly analyzed and applied policies, that Luca had difficulty with time management and managing his workload, and that Bazzi would not hire Luca if there was a vacancy at the Wyoming office.

These additional statements are what make Bazzi's reference "negative" in the first place, insofar as it is questionable whether his completion of the questionnaire would be an adverse employment action if he omitted those statements.  Thus, the Agency's failure to support the statements which make the questionnaire decidedly negative in the first place means that it cannot discharge its burden at step two of *McDonnell Douglas*.

For his part, Luca offers proofs showing that he was a good worker.  He points to the October 2014 email, which discusses the later reference from Luca's supervisor.  (*See* ECF No. 25-4.)  That reference stated that Luca: had good written communication skills; had good interpersonal skills; completed tasks accurately, timely, and independently; and, was able to handle sensitive situations and manage his own leave.  The October 2014 email also states that he had interviewed well for the other promotion he had applied for.  This suggests that Bazzi's negative reference may not have been motivated by a desire to truthfully describe Luca's job performance.[9]

---

[9] Luca says that Bazzi gave this subsequent positive reference. It is unclear whether

The Agency pushes back and argues that other materials in the record do not show pretext.  These other materials, the Agency says, show that "Luca's performance was not consistent prior to Bazzi's negative reference."  (ECF No. 32, PageID.684).  But the Agency ignores the proofs upon which Luca relies, namely, the October 2014 email.

The Agency also invokes the so-called "honest belief" rule.  *See generally Smith v. Chrysler Corp.*, 155 F.3d 799, 805–09 (6th Cir. 1998).  That rule recognizes that "if an employer has an 'honest belief' in the nondiscriminatory basis upon which it has made its employment decision (i.e. the adverse action), then the employee will not be able to establish pretext" under *McDonnell Douglas*. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530–31 (6th Cir. 2012) (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)).  Luca, the Agency says, cannot show that Bazzi did not honestly believe the statements he made in the questionnaire.

The honest belief rule doesn't help the Agency.  The rule's "key inquiry is whether the employer made a reasonably informed and considered decision before taking the complained-of action."  *Id.* at 531 (citation altered).  To that end, "[t]he employer . . . must point to particularized facts upon which it reasonably relied."

---

that is the case. But even if another supervisor gave the positive reference, the fact that Luca received it at all suggests that the reasons the Agency gives for Bazzi's negative reference are or could be pretextual.

*Id.* The Agency points to no such particularized facts. It merely says that Luca's trainee status justified Bazzi's negative reference, but the Agency offers nothing supporting the most negative statements in the questionnaire.

In sum, the Agency does not substantiate Bazzi's reference, and Luca comes forward with evidence suggesting that the reference was untruthful. Given that Luca can make out a *prima facie* case of retaliation under the participation clauses, his retaliation claims under those clauses survive summary judgment. But he cannot make out a *prima facie* case of retaliation under the opposition clauses, so his opposition-clause claims fail.

## CONCLUSION & ORDER

The Agency is entitled to summary judgment on Luca's opposition-clause claims but not his participation-clause claims. Accordingly, **IT IS ORDERED** that the Agency's motion for summary judgment (ECF No. 20) is **GRANTED** to the extent that it seeks summary judgment for the Agency on Luca's opposition-clause claims and is **DENIED** in remaining part.

Having resolved all other issues, the sole remaining issue is whether Luca can proceed on his participation-clause claims. The Court will conduct a status conference via Zoom on **Friday, October 24, 2025, at 10:00 a.m.** to determine how best to address this remaining issue, whether it be by entertaining a final

motion under Fed. R. Civ. P. 56, proceeding to bench trial on this issue, or perhaps resolving the issue by a trial on the papers through motions for judgment.

     **IT IS SO ORDERED**.

Dated: September 30, 2025

Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE